NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No.  05-37154/JHW |
| Chantell P. Parks | : | |
| Debtor | : | |
| Silver Care Center | : | Adver. No. 05-2774 |
| Plaintiff | : | |
| v. | : | **OPINION** |
| Chantell P. Parks | : | |
| Defendant | : | |
| | : | |

APPEARANCES:      David Paul Daniels, Esq.
                  3300 Federal Street
                  Camden, New Jersey  08105
                  Attorney for Defendant

                  Robert L. Saldutti, Esq.
                  Lario & Saldutti
                  89 North Haddon Avenue
                  Haddonfield, New Jersey  08033
                  Attorney for Plaintiff

**FILED**

JAMES J. WALDRON, CLERK

July 10, 2007

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Terry O'Brien,
Judicial Assistant to
Chief Judge Wizmur

In this adversary proceeding, plaintiff, Silver Care Center, a nursing home which

provided services to the debtor's mother, Elnora Parks, asserts that the obligations of the debtor

-1-

due to the plaintiff are nondischargeable under sections 11 U.S.C. § 523(a)(2)(A) and 523(a)(4).[1]

The plaintiff charges the debtor with converting and misappropriating funds while she acted as a

fiduciary to her mother, and with failing to properly administer her mother's funds.  As well, the

plaintiff asserts that the debtor should be precluded from obtaining a discharge under 11 U.S.C. §

727.

Because the plaintiff failed to show the debtor's intent to defraud the plaintiff, and failed

to establish the debtor's defalcation in a fiduciary capacity, the debtor may retain her Chapter 7

discharge, and may be discharged of the debt due from her to the plaintiff.

### FACTS AND PROCEDURAL HISTORY

The debtor, Chantell P. Parks, filed her Chapter 7 petition on August 24, 2005.[2]  She

scheduled approximately $165,000 in unsecured debt, $123,931 of which was due to the

plaintiff, Silver Care Center.  On October 4, 2005, Silver Care filed a two count complaint

against the debtor seeking to have its debt determined to be nondischargeable and to deny the

debtor her discharge.  Following trial, additional submissions were received from the parties

through February 27, 2007.

---

[1]     In a post-trial submission, the plaintiff mentioned section 523(a)(6).  However, that section was not pled in the complaint, and will not be considered herein.

[2]     John W. Hargrave, Esq. was appointed the Chapter 7 trustee.  He filed a no asset report on November 4, 2005 and the debtor received her discharge on November 25, 2005. Although the discharge should not have been issued during the pendency of this complaint, the discharge need not be disturbed in light of this opinion.

The debtor's obligation to Silver Care Center arises from the services provided to the debtor's mother by Silver Care, commencing in August 2003.  Elnora Parks was admitted in that month to the Silver Care facility.  At the time of Elnora's admission, the debtor signed a Power of Attorney on behalf of her mother, authorizing the debtor to act on her mother's behalf in all respects.[3]  The debtor signed all of the admission documents on her mother's behalf.  She also executed a "Responsible Party Agreement" in which the debtor agreed to pay all charges incurred by her mother not otherwise paid for by a third party payee.[4]

For the first 100 days of her stay at Silver Care, Elnora's costs were covered under her managed care insurance policy.  The debtor was informed some time in October 2003 that application had to be made to Medicaid for continuing coverage of her mother's nursing home costs.  The debtor made application to the Medicaid office, but the application was denied in November 2003 for failure to provide all of the necessary information.

According to the debtor, the primary information that was missing was information about her father's income.[5]  Although her mother and father listed their permanent residence at the same Sicklerville address, the debtor's father Jonathan had been involved with another woman,

---

[3]      The debtor testified that her mother instructed her to sign the document, and that she did so in her mother's presence.

[4]      Exh. P-13.

[5]      The denial notice from the Camden County Board of Social Services reflected several missing items, including pay stubs from the debtor's father.

Vincenteen, since the fall of 2002.[6]  The debtor testified that her father visited her mother on a

daily basis at the nursing home, but that the debtor was not able to retrieve from her father the

information about his income and assets that was necessary to complete the Medicaid

application.  At her mother's instruction, in January 2004, the debtor hired a divorce lawyer, who

attempted to subpoena the income information.  Around the same time, the debtor also hired

another attorney, Jerold E. Rothkoff, Esq., to assist with the Medicaid application.  According to

the debtor, upon Mr. Rothkoff's advice, certain liquid assets of her mother were transferred to the

debtor to allow Elnora to qualify for Medicaid benefits.  As well, upon Elnora's direction,

Elnora's interest in her home was transferred to the debtor's father.

In or about April 2004, Elnora left the Silver Care facility and was hospitalized for

several weeks.  Following her hospitalization, Silver Care refused to re-admit Elnora unless the

outstanding bill for services rendered was paid.  Although attempts to obtain retroactive

Medicaid approval continued, the application was ultimately unsuccessful.  Elnora was admitted

to another nursing home in or about May 2004, and passed away on or about August 14, 2004.

The debtor's father Jonathan passed away in March 2006.

From the time the general power of attorney for Elnora Parks was signed on August 8,

2003 until Elnora's death in August 2004, the debtor handled her mother's financial affairs,

always following her mother's direction and wishes.  The debtor testified that while her mother

suffered from multiple sclerosis and was on a ventilator during her stay at Silver Care, she was

---

[6]        Jonathan married Vincenteen in the fall of 2004, after Elnora's death.

entirely coherent and cognitively stable throughout her stay at the nursing home and remained so

until she died.  She would routinely advise the debtor about what she wanted the debtor to do

with her money, including directing the debtor to give large amounts of money to the debtor's

father Jonathan, who would request money from Elnora to maintain household expenses and for

his own personal needs.

The claim by Silver Care that the debtor misappropriated, converted and/or failed to

account for her mother's assets is premised upon the debtor's exercise of control over the various

sources of Elnora's funds, including Elnora's monthly pension checks, monies deposited into a

checking account held by the debtor on behalf of her mother, a lump sum social security

payment, the proceeds of a personal injury settlement, and the proceeds of a life insurance policy.

Each of these sources of funds is discussed below.  To some extent, the funds from these various

sources may be traced through three bank accounts, including Elnora's savings account, a joint

checking account in the name of Jonathan and Elnora Parks, and an account held in the name of

the debtor for the benefit of her mother (referred to hereinafter as the "7857 account").

A.      <u>Pension Checks</u>.

Elnora received $2,432.67 each month on account of her pension.  The debtor deposited

each monthly payment into Elnora's savings account, and then transferred the entire payment into

her parents' joint checking account to utilize for household expenses.  From August 2003

through May 2004, approximately $24,300 in monthly pension checks were deposited into

Elnora's savings account, and then transferred into Jonathan and Elnora's joint checking account.

Checks were written on that joint account by both Jonathan and by the debtor on behalf of her

mother.  Between August 2003 and March 2004, over $20,000 was spent on the parents'

household expenses, including mortgage payments, car payments, utilities and insurance.  In

addition to the payment of household expenses, the account was used actively by the debtor's

father, Jonathan, who withdrew $19,000 in cash from the account between October 11, 2003, and

March 30, 2004.  Starting in June 2004, each of Elnora's monthly pension checks was directed

by the debtor to the new nursing home in which her mother remained until her death in August

2004.

Although no bank statements were introduced, and there is no information about the

sources of deposits into this account in addition to Elnora's $24,300 of pension checks, the

disbursements and withdrawals from this account totalling nearly $40,000, made for the benefit

of the debtor's parents, substantially discount the plaintiff's claim that the debtor

misappropriated her mother's monthly pension checks.

B.     The 7857 Account.

As noted above, the debtor maintained a checking account in her own name, the 7857

account, which she used to deposit monies belonging to Elnora, and to pay for various expenses

on behalf of Elnora.  The account was opened in August 2003, when Elnora entered Silver Care,

and remained open until after Elnora's death in August 2004.

Approximately $34,000 was deposited into this account between August 2003 and

September 2004.[7]  Among the deposits was a transfer of $5,545 from Elnora's savings account

on February 17, 2004.  This transfer was made on the advice of the attorney retained by the

debtor on behalf of her mother, Jerold Rothkoff, to assist in her mother's application for

Medicaid assistance.  The debtor understood that her mother would be eligible for Medicaid

benefits, i.e., payment of her nursing home costs by the State of New Jersey, only if the aggregate

amount of liquid assets in her name was below $4,000.

Another significant deposit into the 7857 account was the amount of $20,276.58

deposited on June 26, 2004.  Elnora owned approximately $17,000 worth of annuities, which the

debtor liquidated on her mother's direction sometime in June 2004.  The June 26th deposit

apparently includes the proceeds from those annuities.

As to disbursements from the 7857 account from August 2003 through September 2004,

approximately $43,000 was disbursed by the debtor from the account.  Included in the

disbursements were checks written for Elnora's funeral expenses[8] and for various attorney's fees,

including fees to Jerold E. Rothkoff ($3,000), the Medicaid expert, and Jim Weiss ($1,200), who

was consulted about filing bankruptcy on behalf of Elnora.  Other expenses incurred on behalf of

Elnora during this period included pharmacy bills to Silver Care, other medical bills, and

---

[7]      The monthly bank statements on the 7857 account were not produced at trial.
Except for the lump sum deposits noted, the sources of deposits into this account are not known.

[8]      Funeral expenses included the Hillcrest Center ($1,397.50) and the Baswell
Funeral Home, Inc. ($5,520).

payments toward utilities and municipal charges on her residence.

Of the $43,000 in disbursements during the 13-month period in question, $26,616 was disbursed directly to the debtor, either by way of checks made out to cash, or checks made out to the debtor directly.  The debtor testified that she paid some of her mother's expenses by money order, and did not maintain money order receipts once a bill was paid.  She also testified that her mother directed her to distribute the proceeds of the liquidated annuities to family and friends, including contributions to her church, Saint Matthews Baptist Church, for which the debtor maintained no receipts.  Other disbursements directed by Elnora included the cost of an elaborate baby shower for the debtor at the Silver Care facility in April 2004, and various purchases for Elnora throughout her hospitalizations, including DVD players, audio tapes and special blankets. Elnora also gifted some money to the debtor.  As well, and most notably, the debtor testified that her mother directed her to give large amounts of money, in cash, to her father, Jonathan, who always needed money and always asked for money from her mother.  According to the debtor, her mother hoped that the monies directed to Jonathan would assist him in maintaining household expenses while she was ill.  As noted above, although Elnora retained an attorney in January 2004 to prosecute a divorce action against Jonathan, he continued to visit her on a daily basis at the nursing home.[9]

Silver Care attempted to discredit the debtor's testimony that her mother directed her to

---

[9]     The record is not clear as to whether a judgment of divorce was entered between Elnora and Jonathan before Elnora's death in August 2004.

give large amounts of money to her father during the time frame in question by offering the

testimony of Vincenteen Parks, the woman whom Jonathan married in the fall of 2004, following

Elnora's death.  Vincenteen testified that Jonathan never received cash from his daughter during

the time frame between August 2003 and August 2004.  She testified that she would have known

about his receipt of cash because she "was handling his [financial] affairs for him at the time".

(T7-3, October 18, 2006).


Vincenteen's clarifications later in her testimony shed substantial doubt on her ability to

ascertain whether Jonathan received large amounts of cash from the debtor between August 2003

and August 2004.  Vincenteen acknowledged that she did not actually handle his bank account,

and was not sure if he had a joint bank account with Elnora.  Vincenteen did not have a joint

account with Jonathan, and did not actually reside with Jonathan until after Elnora died.  She

traveled between Jonathan's home in Sicklerville, New Jersey, and her "transient" home in

Philadelphia, where her children resided.  She ultimately stated that "I handled all of his affairs

that he gave me that I knew about."  (T15-12, October 18, 2006).


I fully accept Vincenteen's testimony that she played a major role in assisting Jonathan in

handling his financial affairs.  However, her testimony does not serve to discredit the debtor's

contention that her mother directed her to make substantial cash payments to her father during

the period in question, and that she did so.  The credibility of the debtor's testimony in this

respect is enhanced by the documented withdrawal of approximately $19,000 by Jonathan from

the joint checking account of Elnora and Jonathan during the same time frame, which tends to

show that Jonathan routinely handled large amounts of cash to accommodate his needs.

Silver Care attempted to discredit the debtor further by claiming that she failed to cooperate with Silver Care in applying for Medicaid benefits on behalf of her mother.  Again, Silver Care's efforts in this regard fail.  The debtor was advised sometime in October 2003 that her mother's managed care benefits would terminate, and that she needed to apply on her mother's behalf for Medicaid benefits.  By notice received from the Camden County Board of Social Services dated November 17, 2003, the debtor was advised that certain additional information, including her father's pay stubs, would be needed.  She attempted to gather the additional information requested, but had particular difficulty obtaining information from her father.  On behalf of her mother, the debtor hired a divorce lawyer sometime in January 2004, and an attorney to assist with the Medicaid application in February 2004.  In February 2004, she had contact with Krista Valente, a claims representative from Silver Care.  Ms. Valente recalled that she required the debtor to turn over Elnora's pension checks while she was at the nursing home, but the debtor denies that she was asked to turn over the pension checks.

The debtor's memory of the contact with Ms. Valente, in particular, whether she was asked to turn over her mother's pension checks, is accepted here for several reasons.  First, Ms. Valente's notes of the conversation did not reflect that demand, and she acknowledged that she was more concerned about the approval of Elnora's Medicaid application and about telling the debtor to apply for state disability payments on behalf of her mother to facilitate the approval of the Medicaid application, than she was about Elnora's monthly pension checks.  Second, we

know that when Elnora relocated to the Prospect Park Nursing Home in June 2004, the debtor was requested to turn over her mother's monthly pension check, and that she did so each month until her mother's death.  Third, the attorney hired by the debtor on behalf of her mother to assist in the Medicaid application process, Jerold Rothkoff, continued to attempt to negotiate with Silver Care and with Medicaid regarding retroactive Medicaid approval, even after Elnora passed in August 2004, signifying that the debtor continued her good faith efforts to obtain Medicaid approval on behalf of her mother.

The debtor presented a plausible and credible picture of her efforts to administer her mother's financial affairs while her mother was a patient at the Silver Care Nursing Home, and until her mother's death in August 2004.  She was the only child of Elnora and Jonathan.  She followed her mother's direction to distribute her mother's money in various ways, including giving significant sums to her father Jonathan.  The record of the debtor's personal checking account does not show any unusual deposits that would be consistent with the receipt of significant sums of money from her mother's account, and is entirely consistent with the debtor's earnings during the period in question.[10]  Silver Care has not succeeded in establishing as a factual matter that the debtor misappropriated or converted funds from the 7857 account.

     C.     <u>Social Security Payment</u>.

---

[10]     The debtor's personal checking account, used for her own personal expenses, shows deposits of $52,534.75 during the fourteen month period between July 24, 2003 and September 27, 2004.  Her annual gross income at the time was approximately $55,000 to $60,000.  Over a fourteen month period, the debtor's gross income appears to have been close to $70,000.

Following Elnora's death in August 2004, a lump sum Social Security payment in the approximate amount of $25,000 was received by the debtor. The debtor deposited the payment in Elnora's decedent's estate account. The debtor, as the only child of the decedent, is the executor of her mother's estate. She retained an attorney, Christian A. Pemberton, Esq., to assist in the administration of the estate. The Social Security monies remain on hand as a part of Elnora's estate, and are, therefore, not implicated in any allegation of misappropriated funds by the debtor.

D.    Life Insurance Proceeds.

In December 2004, the debtor received life insurance proceeds of $18,000 following her mother's death, as sole beneficiary under the policy. She testified that she spent the money to purchase furniture for her new home. The money received by the debtor from her mother's life insurance policy was hers to spend, and she need not account for it more specifically than she has done.[11] See, e.g., N.J.S.A. 17B:24-6 ("If a policy of insurance . . . is affected by any person on his own life, . . . in favor of a person other than himself, . . . then the lawful beneficiary, . . . shall be entitled to its proceeds and avails against the creditors and representatives of the insured"); N.J.S.A. 17B:24-9(a) ("A policy of group life insurance . . . or the proceeds thereof payable . . . to the beneficiary thereunder, shall not be liable, either before or after payment, to be applied by any legal or equitable process to pay any debt or liability of such insured individual").

_____

[11]    The plaintiff does not rely on 11 U.S.C. § 727(a)(3) or (a)(5) to deny the debtor a discharge because she failed to keep or preserve records of her financial condition, or because she failed to explain satisfactorily any loss of assets to meet the debtor's liabilities.

-12-

E.      Personal Injury Settlement.


During her hospitalization at Jefferson Hospital in Philadelphia, Pennsylvania, around

December 2002, Elnora was allegedly injured by actions or inactions of the hospital staff.  Elnora

and her husband Jonathan filed suit.  A settlement was reached, and Elnora's portion of the

settlement was $15,307.  The debtor received these funds on or about March 24, 2005, after her

mother's death.  The debtor testified that she used the proceeds of the personal injury recovery to

reimburse herself for expenses incurred on behalf of her mother, including funeral expenses.

However, I cannot substantiate the debtor's contention in this regard, particularly in light of the

payment of funeral expenses and several attorneys' bills documented by the records of the 7857

account, as well as the apparent reimbursement to the debtor of other expenses related to the

funeral in September 2004.[12]  The debtor did not offer any further information about what

happened to this fund.


The contentions of Silver Care that the debtor misappropriated or converted her mother's

funds and violated her fiduciary responsibilities to her mother are premised on the notion

advanced by Silver Care at trial that between August 2003 through September 2004, the debtor

controlled approximately $186,000 belonging to herself and to her mother, and that the debtor is

unable to account for a significant amount of that money.[13]  From August 2003 to September

---

[12]      Following Elnora's death, the debtor hired an attorney, Christian Pemberton, Esq.,
to handle the administration of her mother's estate, and paid him $3,000 for doing so.  The
source of that payment is not apparent from the record.

[13]      Exh. F-1.

2004, the debtor was a teacher earning an annual salary of approximately $55,000 to $60,000 per year.  She also served as head coach for three sports, and was paid in that capacity.  She purchased a house during the summer of 2003, and had a baby in the late spring of 2004.  From late July 2003 through September 2004, the debtor's personal bank account reflects total deposits of $52,534.75.  This cumulation of deposits is generally consistent with the debtor's earnings during this period.

Silver Care's presentation regarding the monies "controlled" by the debtor and her inability to account for those monies is misleading and incorrect for several reasons.  First, the analysis, which purports to cover the period from August 2003 through September 2004, includes monies received after that time frame, including $25,000 as a lump sum social security check, $15,307 from the personal injury settlement, and the life insurance disbursement in the amount of $18,000 to the debtor.  The social security check is being held as part of Elnora's estate.  Second, the contention that the debtor should be charged with approximately $25,000 in credit card debts (Beneficial Finance, Citi Cards and MBNA), all of which are listed on her petition, does not account for the fact that at least some and possibly all of these credit card debts were incurred before August 2003.  Such debts cannot be charged to the debtor as cash available to her between August 2003 and September 2004, but represent expenses incurred by the debtor over a period of years.  Third, the inclusion of Elnora's pension checks is mistaken.  Erroneously included in the calculations were three pension checks for June, July and August which the debtor did not retain, but which were given to the nursing home which Elnora entered after she left Silver Care.  In addition, the analysis fails to recognize that during Elnora's stay at Silver Care, the pension

-14-

checks were actually deposited into the joint checking account of Elnora and Jonathan and used

to pay the debtor's parents' household expenses.  As well, Jonathan withdrew $19,000 from that

account during the period in question.  Lastly, the analysis utilized the debtor's gross annual

wages, which are not reflective of the actual monies she received from her employment during

the year, and did not account for the proper and ordinary use by the debtor of her wages for

ordinary living expenses.  Silver Care's presentation in this regard was entirely discredited.


To recap the factual presentation at trial, the debtor has successfully accounted for the use

of her personal funds achieved from her employment, her mother's monthly pension checks, and

the lump sum social security payment received by her mother's estate.  She has offered

substantial explanation regarding the $26,616 disbursed directly to her from the 7857 account, as

well as information regarding the life insurance proceeds that she received in December 2004.

The debtor has failed to satisfactorily account for the proceeds of the personal injury settlement

in the amount of $15,307 that she received in March 2005.


## DISCUSSION


The complaint filed herein seeks to declare the debt due to the plaintiff Silver Care from

the debtor to be nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4), and seeks to deny

the debtor a discharge under 11 U.S.C. § 727(a)(2).  Silver Care contends that the debtor is liable

as a result of actions taken pursuant to the Power of Attorney, the Responsible Party Agreement,

and as executor for her mother's estate.  There is no question that as guarantor of her mother's

debt to Silver Care, the debtor owes a debt to Silver Care.[14]  To be resolved here is whether the

debtor's actions warrant a denial of discharge under section 727, and/or whether the debt to the

plaintiff is nondischargeable under section 523.  We turn first to consideration of the plaintiff's

request to deny the debtor her discharge.

A.    Section 727(a)(2).

In the second count of the complaint filed by Silver Care, the plaintiff objects to the

debtor's discharge, citing to 11 U.S.C. § 727(b).  Because subsection 727(b) is not applicable to

the factual circumstances presented here,[15] I sought clarification from plaintiff's counsel after the

trial regarding the basis of the plaintiff's objection to discharge.  By letter dated January 29,

2007, plaintiff's counsel referenced 11 U.S.C. § 727(a)(2)(A) to support the contention that the

---

[14]    Silver Care sued the debtor in Superior Court of New Jersey, Law Division, under
Docket No. L-004012-04, to recover the amount due from the debtor.  Summary judgment in
favor of Silver Care and against the debtor in the amount of $123,930 was entered in state court
prior to the filing of the debtor's bankruptcy petition.  Although the issues of claim preclusion
and issue preclusion were raised by the plaintiff, they were rejected at the oral argument on the
summary judgment motions in this case because the plaintiff failed to demonstrate that the
requisite elements of section 523 or 727 were established in the state court proceeding.

[15]    Section 727(b) provides:

Except as provided in section 523 of this title, a discharge under
subsection (a) of this section discharges the debtor from all debts that arose before
the date of the order for relief under this chapter, and any liability on a claim that
is determined under section 502 of this title as if such claim had arisen before the
commencement of the case, whether or not a proof of claim based on any such
debt or liability is filed under section 501 of this title, and whether or not a claim
based on any such debt or liability is allowed under section 502 of this title.

11 U.S.C. § 727(b).

-16-

debtor's alleged wrongful actions warranted a denial of discharge.

Section 727, under which a Chapter 7 debtor is granted a discharge unless specified grounds for denying a discharge are established, has been described as the "heart of the fresh start provisions of the bankruptcy law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 384 (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 98 (1978). Denying a discharge to a Chapter 7 debtor is an extreme remedy that should not be taken lightly, and the application of the section 727 grounds for denial of discharge should be construed liberally in favor of the debtor. Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993).

As noted, the plaintiff relies on section 727(a)(2)(A) to deny the debtor her discharge. Section 727(a)(2) provides in relevant part:

> (a)      The court shall grant the debtor a discharge, unless—
> . . .
>          (2)      the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
>          (A)      property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A). The movant must show by a preponderance of the evidence that there was:

(1) a transfer or concealment of property;

(2) belonging to the debtor;

-17-

(3) that occurred within one year of the filing of the petition, and

(4) which was accomplished with the actual intent to hinder, delay, or defraud a
creditor or officer of the estate.

See In re Pratt, 411 F.3d 561, 565 (5th Cir. 2005); In re Brown, 108 F.3d 1290, 1293 (10th Cir.

1997); In re Boyer, --- B.R. ----, 2007 WL 1079941, *6 (Bankr. D.Conn. Apr. 9, 2007).  The

exception to discharge consists primarily of two components: "an act (i.e., a transfer or

concealment of property) and an improper intent (i.e., subjective intent to hinder, delay, or

defraud a creditor)."  Rosen v. Benzer, 996 F.2d 1527, 1531 (3d Cir. 1993).  While the debtor

may have committed an act of transfer during the year before her bankruptcy filing within the

meaning of the statute, the facts presented at trial do not support the essential statutory

component of improper intent.


The debtor filed her bankruptcy petition on August 24, 2005.  The only "transfers" of

property that might be implicated during the one year before the date of the filing are the lump

sum social security payment, the life insurance proceeds and the personal injury recovery.  The

social security payment is property of Elnora's decedent's estate, and was deposited by the debtor

into her mother's decedent's estate account.  The life insurance proceeds were received by the

debtor, as sole designated beneficiary, in December 2004.  The debtor spent the money on

furniture for her new house.  In March 2005, the debtor received $15,000 as a settlement of a

personal injury action belonging to her mother.  She kept that money, and presumably spent it.

She credibly testified that she believed that she was entitled to be reimbursed for monies she

spent on behalf of her mother.

On these facts, while no concealment of the debtor's property is alleged, the receipt of
funds by the debtor, in particular, the life insurance proceeds and the personal injury settlement,
and the dissipation of the funds during the year before the filing, technically qualifies as a
transfer, as that term is defined in the Bankruptcy Code.  A transfer is defined in section 101 as:

(A) the creation of a lien;

(B) the retention of title as a security interest;

(C) the foreclosure of a debtor's equity of redemption; or

(D) every mode, direct or indirect, absolute or conditional, voluntary or
involuntary, of disposing of or parting with property or with --

(i) property; or

(ii) an interest in property.

11 U.S.C. §  101(54).   The definition of "transfer" is expansive, and would certainly encompass
the debtor's act of spending the funds she received for personal expenses.  What is missing here
is a convincing factual basis from which we could infer that the dissipation of funds by the debtor
was accompanied by an actual intent to hinder or defraud creditors.  "In making the
determination regarding subjective intent, the court should consider [the debtor's] own testimony
regarding [her] state of mind as well as the surrounding circumstantial evidence of intent."
Rosen v. Bezner, 996 F.2d at 1534.

The debtor's act of spending the life insurance proceeds she received as sole beneficiary
of the policy to buy furniture for her new home cannot give rise to an inference that she spent the

money with the actual intent to defraud her creditors.

As to the debtor's dissipation of the proceeds of her mother's personal injury settlement, I find credible her testimony that she considered the money to constitute reimbursement to her for expenses incurred by her on behalf of her mother while she was alive, and for her mother's funeral expenses. As reflected by the presentation of both parties at trial, the several bank accounts handled by the debtor on behalf of her mother and the various sources of funds complicated the ability of the parties to understand the flow of funds through the various accounts. For instance, the plaintiff, in its trial presentation of the moneys available to the debtor prior to her mother's death, lost sight of the fact that the mother's monthly pension checks were deposited into the debtor's parents' joint account and spent for the parents' expenses. In asserting that the debtor misappropriated her mother's lump sum Social Security payments, the plaintiff lost sight of the fact that the Social Security payments were deposited by the debtor into her mother's decedent's estate account and are still on hand. Similarly, the debtor lost sight of the fact that all or most of her mother's legal expenses and funeral costs were paid from the account held by the debtor in her own name on behalf of her mother, rather than from her own funds, which might have entitled her to some reimbursement.

A denial of discharge under section 727(a)(2)(A) customarily involves a transfer or concealment by the debtor of an interest in property wherein the debtor retains some secret interest in the property transferred, i.e., the debtor hides the property so that it is out of the reach of her creditors but will be available to her after she receives her discharge. See, e.g., Rosen v.

-20-

<u>Bezner</u>, 996 F.2d at 1532.  There must be in fact some secret interest, such as where the debtor

has "retained control or an equitable interest in the property" for the discharge to properly be

denied.  <u>In re Oliver,</u> 819 F.2d 550, 553 (5th Cir. 1987) (quoting <u>In re Smith</u>, 11 B.R. 20, 22

(Bankr. N.D. Ohio 1981)).  <u>See also</u> <u>In re Coven</u>, No. 06-4323 , 2007 WL 1160332, *6 (D.N.J.

Apr. 17, 2007) ("A fraudulent concealment may arise when the debtor transfers property to a

third party but retains control or a beneficial interest in such property.").  No such transfer or

concealment is apparent here.


Here, there is no demonstration by the plaintiff that the debtor has retained some secret

interest over which she retains control, or that she intended to defraud the creditors by spending

the life insurance proceeds and the personal injury recovery.  The plaintiff's quest to deny the

debtor a discharge under section 727(a)(2)(A) must fail.


B.    <u>Section 523(a)(2)(A)</u>.


In the first count of the complaint filed by Silver Care, the plaintiff seeks to declare the

debt due from the debtor to be nondischargeable under section 523(a)(2)(A), claiming that the

debt was incurred by fraud.  That section provides:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
> does not discharge an individual debtor from any debt —
> 　　. . . .
>
> 　　(2)  for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained by —

> (A)  false pretenses, a false representation, or actual fraud, other
> than a statement respecting the debtor's or an insider's financial
> condition.

11 U.S.C. § 523(a)(2)(A).  In order to satisfy section 523(a)(2), the plaintiff must prove its case

by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 287-88, 111 S. Ct. 654,

659-60, 112 L. Ed.2d 755 (1991); In re Hilley, 124 Fed.Appx. 81, 82 (3d Cir. 2005); In re

Barnaby, No. 05-33096, 2007 WL 750332, *1 (Bankr. D.N.J. Mar. 6, 2007); In re Casini, 307

B.R. 800, 815 (Bankr. D.N.J. 2004).  To establish nondischargeability under section

523(a)(2)(A), plaintiff must show that:

> (1) the debtor made the misrepresentations;
>
> (2) that at the time he knew they were false;
>
> (3) that he made them with the intention and purpose of deceiving the creditor;
>
> (4) that the creditor relied on such representations;
>
> (5) that the creditor sustained the alleged loss and damage as the proximate result
> of the representations having been made.

In re Hashemi, 104 F.3d 1122 (9th Cir.), cert. denied, 520 U.S. 1230, 117 S. Ct. 1824, 137 L.

Ed.2d 1031 (1997).  See also In re Spigel, 260 F.3d 27, 32 (1st Cir. 2001); In re Harmon, 250

F.3d 1240, 1246 (9th Cir. 2001); In re Daley, No. 05-87138, 2007 WL 605019, *2 (Bankr.

C.D.Ill. Feb. 22, 2007); In re Christofaro, 360 B.R. 411, 414 (Bankr. W.D.N.Y. 2007).

The plaintiff has failed to sustain a claim for nondischargeability under section

523(a)(2)(A) for three reasons.  First, the plaintiff has failed to establish that the debt due from

the debtor to the plaintiff was obtained by false pretenses, false representations or fraud.  Second,

even if the plaintiff's allegations that she misappropriated funds belonging to her mother are true,

any fraud committed by the debtor while her mother was alive would have been committed

against her mother, not against the plaintiff. Third, the plaintiff has failed to establish the

requisite section 523(a)(2)(A) element of intent to deceive the plaintiff in connection with her

actions.

     1.     <u>Debt "Obtained" by Fraud</u>.

Section 523(a)(2)(A) requires that the plaintiff show evidence of a debt, for money,

property, services or credit, that was "obtained by" false pretenses, false representations or actual

fraud.

> The language "obtained by" clearly indicates that the fraudulent conduct occurred
> at the inception of the debt, i.e., the debtor committed a fraudulent act to induce
> the creditor to part with its money, property or services. . . . Misrepresentations
> made subsequent to the creation of the debt "have no effect upon the
> dischargeability of a debt, since the false representation could not have been the
> creditor's reason for the extension of credit." <u>In re Woodall</u>, 177 B.R. at 524
> (citation and internal quotation marks committed); <u>see also</u> <u>4 L. King, Collier's on
> Bankruptcy</u>, § 523.08[1][d], 523-44 (15th ed.1999) ("If the property or services
> were obtained before the making of any false representation, subsequent
> misrepresentations will have no effect on dischargeability.").

<u>In re Hrabik</u>, 330 B.R. 765, 772-73 (Bankr. D.N.D. 2005).  <u>See also</u>, <u>In re Woodrow</u>, No. 05-

32145, 2006 WL 4392691, *5 (Bankr. D.N.D. May 26, 2006)(the creditor "must make a

threshold showing that the alleged fraud existed at the time of, and has been the methodology by

which, the money, property or services were obtained.").  In Hrabik, the creditor, a long-term

care facility, charged the debtor, who held a power of attorney for his mother, with failing to pay

his mother's debts as they became due, using his power of attorney instead to fraudulently

transfer his mother's funds to himself.  "This allegation, even if true, is insufficient to support a

claim under section 523(a)(2)(A) because the services provided to [the debtor's mother] by [the

creditor] were not obtained through any alleged fraud or misrepresentation."  Id. at 773.


Similarly, in this case, there is no factual support for the plaintiff's contention that the

services obtained by the debtor's mother were "obtained" by the debtor's fraud, false pretenses or

false representations.  The debtor incurred a debt to Silver Care when she admitted her mother to

Silver Care and signed a "Responsible Party Agreement" in which she agreed to pay all charges

incurred by her mother not otherwise paid for by a third party payee.  That the debtor incurred the

debt to Silver Care as a "Responsible Party" is clear, but what was fraudulent about the incurring

of debt by the debtor in this regard is not.


The plaintiff supports its 523(a)(2)(A) claim by contending that the debtor's action in

signing the Power of Attorney herself, rather than having her mother sign it, was improper and

illegal.  I need not decide here whether New Jersey law regarding the signing or exercise of a

Power of Attorney was violated by the debtor as she functioned on behalf of her mother, at her

mother's direction, to collect and expend monies belonging to her mother.[16]  I can determine that

the provision of services by the plaintiff to the debtor's mother was not "obtained" based on the

validity of the Power of Attorney executed by the debtor.  The only evidence in the record about

the Power of Attorney is the debtor's testimony that her mother instructed her to sign the

document.  The fact that the Power of Attorney may have been ineffectual does not establish that

the debt to the plaintiff was incurred by fraud for section 523(a)(2)(A) purposes.


2.    Alleged Fraud Not Committed Against the Plaintiff.


As noted above, the debtor owes a debt to Silver Care as a "Responsible Person".

However, the debtor is accused of misappropriating her mother's funds.  Any debt incurred by

the debtor based on misappropriation of her mother's funds belonged to her mother, not to the

plaintiff.  In the course of this litigation, the debtor has actually accounted for the funds she

received and expended while her mother was alive, including the pension checks, the liquidation

of annuities, the lump sum social security payment, and the life insurance proceeds.  But even if

the allegation of misappropriation of her mother's funds while she was alive were proven to be

true, the cause of action based on misappropriation would belong to her mother or her mother's

estate, not to the plaintiff.


It has been held that "the only party that has standing to challenge the dischargeability of

---

[16]    See, e.g., N.J.S.A. 46:2B-8.9 ("A power of attorney must be in writing, duly
signed and acknowledged in the manner set forth in R.S. 46:14-2.1"); N.J.S.A. 46:2B-13 (bank
can refuse to rely on power of attorney if "the signature of the principal is not genuine").

a debt is the party to whom the debt is owed." In re Miller, 270 B.R. 303, 305 (D.Kan. 2001).

See also In re Wilson, 311 B.R. 566, 569 (D.Or. 2004) ("debt must be owed to that creditor"); In

re Kulzer Roofing, Inc., 150 B.R. 134, 138-39 (E.D.Pa. 1992) ("only a party to whom a debt is

owed under the Bankruptcy Code has standing to challenge the dischargeability of that debt"); In

re McClung, 304 B.R. 419, 421-22 (Bankr. D. Idaho 2004).  In other words, an "[o]bjection to

dischargeability under Section 523(a) must always be brought by the particular creditor whose

debt is claimed to be non-dischargeable."  In re Hass, 273 B.R. 45, 49 (Bankr. S.D.N.Y. 2002).

See 11 U.S.C. § 523(c).[17]   The debtor does not owe a debt to the plaintiff based on the alleged

misappropriation of her mother's funds while she was alive.


       The circumstances changed when the debtor's mother died.  Upon her mother's death, the

debtor became the executor of her estate.  New Jersey state law suggests that a creditor of the

decedent's estate may have an action against the executor for misappropriation of estate funds in

certain circumstances.  Where the executor knows of a claim against the estate and distributes

estate assets to a legatee (in this case, to the debtor herself) before the payment of known debts,

the executor may be personally liable to unpaid creditors.  See Pitale v. Leroy Holding Co., 65

---

[17]        Section 523(c)(1) provides that:

Except as provided in subsection (a)(3)(B) of this section, the debtor shall be
discharged from a debt of a kind specified in paragraph (2), (4), or (6) of
subsection (a) of this section, unless, on request of the creditor to whom such debt
is owed, and after notice and a hearing, the court determines such debt to be
excepted from discharge under paragraph (2), (4), or (6), as the case may be, of
subsection (a) of this section.

11 U.S.C. § 523(c)(1) (emphasis added).

N.J. Super. 361, 365, 167 A.2d 828, 830 (Ch. Div. 1961)).  (The "general rule in regard to the

personal liability of an executor is that an executor who makes distribution to legatees or

distributees before the payment of debts is generally personally liable to unpaid creditors

prejudiced thereby who give notice of their claims within the statutory period.")  See also

Coleman v. Director, Division of Taxation, 15 N.J. Tax 529, 534 (Tax Ct. 1996).  Here, the

debtor, as executor of her mother's decedent's estate, is potentially charged with personal

liability to an unpaid creditor of her mother's estate, like Silver Care, for the monies she

distributed to herself from her mother's estate, i.e., the proceeds of the personal injury settlement.

To that extent, Silver Care has standing to seek a declaration under section 523(a)(2)(A) that the

debt due from the debtor to Silver Care is nondischargeable, but must still establish the elements

of nondischargeability, including the debtor's intent to deceive.


        3.        Intent to Deceive.


        The third and most significant reason for denying the plaintiff's quest for a

nondischargeability finding under section 523(a)(2)(A) is that the creditor has failed to establish

the requisite intent to deceive the plaintiff.   As with the section 727(a)(2)(A) cause, section

523(a)(2)(A) requires a sufficient factual basis from which the debtor's intent to deceive creditors

by her actions may be inferred.   The issue of intent requires actual or positive intent.  See

Palmacci v. Umpierrez, 121 F.3d 781, 789 (1st Cir. 1997)(there must "be an actual finding of

intent to deceive"); In re Mayerson, 254 B.R. 407, 411 (Bankr. N.D. Ohio 2000); In re Young,

181 B.R. 555, 558 (Bankr. E.D. Ok. 1995).  At the time of the representation, debtor must have

intended by her representation to deceive the creditor.  In re White, 128 Fed. Appx. 954, 998-99
(4th Cir. 2005);  In re Rubin, 875 F.2d 755 (9th Cir. 1989).  Since intent to defraud or deceive is
rarely admitted, the intent the deceive may be inferred from the surrounding facts and
circumstances of the case.  In re White, 128 Fed. Appx. at 999, In re Atkinson, 14 Fed. Appx.
960, 962 (9th Cir. 2001); In re Van Horne, 823 F.2d 1285, 1287 (8th Cir. 1987); In re Reynolds,
193 B.R. 195, 200 (D.N.J. 1996).

        In the context of the plaintiff's allegations against the debtor that the debtor
misappropriated her mother's funds and failed to properly account for the funds, the plaintiff has
shown that the debtor, as executor of her mother's estate, did not account satisfactorily for the
proceeds of her mother's personal injury settlement.  The plaintiff has a potential cause of action
against the debtor, as the executor for her mother's estate, for the monies disbursed to the debtor
herself from the estate, before satisfaction of estate debts.  Nevertheless, for purposes of
establishing the nondischargeability of the debt due to the plaintiff under section 523(a)(2)(A),
the plaintiff has failed to establish the debtor's intent to deceive, even inferentially.  As I
discussed under the section 727(a)(2)(A) analysis, I found credible the debtor's testimony that
when she spent the proceeds of the personal injury settlement, the debtor believed that she was
reimbursing herself for expenditures she made on behalf of her mother.  Both the plaintiff and the
debtor were confused, even at trial, about the various sources of funds belonging to the debtor's
mother and controlled by the debtor, and the expenditures by the debtor on behalf of her mother
and otherwise.  From these facts, I cannot infer the requisite fraudulent intent by the debtor to
warrant the denial of discharge under section 523(a)(2)(A).  The plaintiff's quest for this relief is

denied.


      C.    <u>Section 523(a)(4)</u>.


      The plaintiff also seeks to declare the debt due from the debtor to be nondischargeable

under section 523(a)(4),[18] which provides for an exception to the dischargeability of any debts

incurred through fraud or defalcation while the debtor was acting in a fiduciary capacity, and also

for those debts incurred through embezzlement or larceny.  <u>In re Clayton</u>, 198 B.R. 878, 885

(Bankr. E.D. Pa. 1996).  The burden of proof is on the creditor to establish the elements of

section 523(a)(4) by a preponderance of the evidence.  <u>See</u> <u>In re Blaszak</u>, 397 F.3d 386, 390 (6th

Cir. 2005); <u>In re Baylis</u>, 313 F.3d 9, 17 (1st Cir. 2002); <u>In re Reid</u>, No. 06-3510, 2007 WL

1406423, *2 (Bankr. N.D.Tex. May 10, 2007); <u>In re Hosey</u>, 355 B.R. 311, 317 (Bankr. N.D.Ala.

2006).  <u>But</u> <u>see</u> <u>In re Niles</u>, 106 F.3d 1456, 1460-61 (9th Cir. 1997) (after a fiduciary relationship

is established, burden shifts to debtor/fiduciary to show that defalcation did not occur).  The

plaintiff asserts that the debtor committed defalcation while acting in a fiduciary capacity.

---

    [18]    Section 523(a)(4) provides:

    (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b)
of this title does not discharge an individual debtor from any debt—
        . . . .

    (4)    for fraud or defalcation while acting in a fiduciary
capacity, embezzlement, or larceny.


11 U.S.C. § 523(a)(4).

-29-

While "fiduciary capacity" is not a defined term under the Bankruptcy Code, courts generally agree that for purposes of section 523(a)(4), the fiduciary relationship must arise in conjunction with an express or a "technical" trust, i.e., a trust imposed by law. In re Regan, 477 F.3d 1209, 1211 n.1 (10th Cir. 2007); In re Blaszak, 397 F.3d 386, 391 (6th Cir. 2005); Hunter v. Philpott, 373 F.3d 873, 875-76 (8th Cir. 2004); In re Cantrell, 329 F.3d 1119, 1125 (9th Cir. 2003). Most courts have held that the requirement of a technical or express trust need not be confined to trusts formed by a formal trust agreement, but may include trust-like obligations imposed by statute or common law. In re Hrabik, 330 B.R. 765, 773 (Bankr. D.N.D. 2005); In re Kohler, 255 B.R. 666, 668 (Bankr. E.D.Pa. 2000); In re Kaczynski, 188 B.R. 770, 774 (Bankr. D.N.J. 1995). "'While the existence of a fiduciary relationship under § 523(a)(4) is determined under federal law, state law is relevant to this inquiry.'" In re Regan, 477 F.3d at 121 n.1 (quoting In re Siegfried, 5 Fed. Appx. 856, 859 (10th Cir. 2001)). The requirements necessary to establish the existence of an express or technical trust include: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." In re Blaszak, 397 F.3d 386, 391-2 (6th Cir 2005). See also In re Kaczynski, 188 B.R. 770 (Bankr. N.J. 1995) and In re Librand, 183 B.R. 379 (M.D. Pa. 1995).

Like the phrase "fiduciary capacity", the term "defalcation" is not defined under the Code. Black's Law Dictionary now defines the term as:

1. Embezzlement. 2. Loosely, the failure to meet an obligation; a nonfraudulent default.

-30-

Black's Law Dictionary at 448 (8th Ed. 2004).[19]  Courts have struggled to reconcile the narrow

exceptions to discharge provided for under the Code with the broad scope of the Black's Law

Dictionary definition of defalcation.  In re Millikan, 188 Fed.Appx. 699, 702 (10th Cir. 2006); In

re Garver, 116 F.3d 176, 179 (6th Cir. 1997) (finding that the Black's Law Dictionary definition

was over broad).  These courts have opined that because embezzlement is separately listed in

section 523(a)(4), defalcation must mean something other than embezzlement.  Id. at 701-02.  As

a result, while it appears that a finding of defalcation "requires, at least, 'some portion of

misconduct,'" Id. at 702 (quoting Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510, 512

(2d Cir. 1973)), courts have addressed the required degree of culpability in various ways.


Some courts require evidence of reckless conduct by the fiduciary.  See, e.g., In re Felt,

255 F.3d 220, 226 (5th Cir. 2001) (requiring willful conduct, described as "essentially a

recklessness standard").  See also In re Baylis, 313 F.3d 9, 20 (1st Cir. 2002) (requiring

"something close to a showing of extreme recklessness").  Other courts employ a negligence

standard.  See, e.g., In re Storie, 216 B.R. 283, 289-90 (10th Cir. BAP 1997); In re Goodwin, 355

B.R. 337, 345 (Bankr. M.D.Fla. 2006).  A third line of cases would find defalcation even in the

case of an innocent mistake.  See, e.g., In re Uwimana, 274 F.3d 806, 811 (4th Cir. 2001) (holding

---

[19]       The definition in Black's Law Dictionary has changed from earlier editions.  A
previous edition provided:

> The act of a defaulter; act of embezzling; failure to meet an obligation;
> misappropriation of trust funds or money held in any fiduciary capacity; failure to
> properly account for such funds.

Black's Law Dictionary at 417 (6th Ed. 1990).

even an innocent mistake can constitute defalcation); <u>Banks v. Gill Distribution Centers, Inc.</u>,

263 F.3d 862, 870 (9th Cir. 2001); <u>In re Cochrane</u>, 124 F.3d 978, 984 (8th Cir. 1997).


In this case, we must distinguish between the role of the debtor as attorney in fact for her

mother before her mother died, and the debtor's role as executor of her mother's will.


1.      <u>Debtor As Attorney in Fact</u>.


During the period from August 2003, when the debtor's mother was hospitalized at Silver

Care, through August 2004, when the debtor's mother passed away, the debtor neither acted in a

"fiduciary capacity", nor committed "defalcation" within the meaning of section 523(a)(4).


Whether or not the Power of Attorney signed by the debtor was valid and enforceable, the

factual record established that the debtor acted as her mother's agent in carrying out her wishes

regarding her mother's financial affairs.  As an agent, the debtor had a fiduciary obligation to the

principal, her mother.[20]  <u>See</u>, <u>e.g.</u>, <u>D'Amato v. D'Amato</u>, 305 N.J. Super. 109, 115, 701 A.2d

970, 973 (App. Div. 1997) (power of attorney imposed a fiduciary duty on the agent to

administer assets solely for the principal's benefit); <u>Manna v. Pirozzi</u>, 131 A.2d 55, 57, 44 N.J.

Super. 227, 230 (App. Div. 1957) ("[W]hen a person undertakes to act as an agent, he assures the

obligations of a fiduciary."). But an ordinary agent-principal relationship, which includes

---

[20]  <u>See</u> N.J.S.A. 46:2B-8.13 (pursuant to the power of attorney, the "attorney-in-fact has a
fiduciary duty to be principal . . . to act within the power delegated . . .  and solely for the benefit
of the principal").

fiduciary duties and responsibilities,[21] is insufficient to establish the type of fiduciary duty

contemplated by section 523.  In re Blaszak, supra, 397 F.3d at 391.  For purposes of section

523(a)(4), the meaning of "fiduciary" is limited to express or technical trusts.  A key element of

an express trust is evidence of intent to create a trust.  No such evidence has been produced here.

Nor is there reference by the plaintiff to a statutorily created trust or a trust imposed upon the

debtor and her mother under common law.


The concept that the existence of a fiduciary relationship created by a Power of Attorney

is not sufficient to warrant a section 523(a)(4) nondischargeability finding was highlighted in the

case of In re McDade, 282 B.R. 650 (Bankr. N.D.Ill. 2002), which has a similar fact pattern to

this case.  In McDade, the debtor's father was admitted to a long term care facility.  The debtor

signed an Admission Agreement as the "responsible party", making her jointly and severally

liable with her father for all charges.  The debtor was also appointed attorney in fact for her father

pursuant to a Power of Attorney which gave her the power to sell his property.  The debtor sold

her father's property and "gifted" herself, as provided for under the Power of Attorney, for work

that she had rendered on behalf of her father.  The facility filed an adversary complaint under

section 523(a)(4) arguing that the Power of Attorney, along with the Admission Agreement,

extended the fiduciary relationship to any third party beneficiaries, including the facility, and

rendered the debt due to the facility from the debtor nondischargeable.


The court concluded that "[t]o qualify under § 523(a)(4), a fiduciary relation must have

---

[21]     See N.J.S.A. 46:2B-19 (under a power of attorney, agent serves as a fiduciary).

an existence independent of a debtor's wrongdoing." 282 B.R. at 658. Turning to state law, the

court recognized that "[w]hile fiduciary relationships may arise outside of express trusts, the

mere existence of a state law fiduciary relationship may not be sufficient to except from

discharge under § 523(a)(4)." Id. The plaintiff asserted that a constructive or implied trust or

fiduciary relationship arose as a result of the Admission Agreement and the Power of Attorney.

The court found "that the Admission Agreement merely created a debtor-creditor relationship",

or simply a contractual relationship which did not rise to the level of a fiduciary relationship. Id.

at 659. The court acknowledged that the Power of Attorney created an express fiduciary

relationship between the debtor and her father, but that relationship did not extend to the creditor.

Id. at 660. "The Creditor was not a party to the Power of Attorney. Moreover, the Creditor was

not the intended beneficiary of the fiduciary relationship between the Debtor and [her father]."

Id. The fact that the Debtor had a fiduciary duty to [her father] does not, ipso facto, under the

subsequent Admission Agreement, extend or bootstrap that duty to third-party creditors (like the

Creditor) of the person owed the duty." Id.


Here, the fiduciary duty owed by the debtor to her mother during the year preceding her

death was not owed to Silver Care, and did not constitute an express trust under section

523(a)(4). The plaintiff's quest for relief in this regard must fail.


Alternatively, during the year preceding her mother's death, the debtor did not commit a

defalcation with regard to her mother's assets. As noted, the courts vary in their assessment of

the degree of culpability required to establish a defalcation. See e.g., In re Felt, 255 F.3d 220,

-34-

226 (5th Cir. 2001) (requiring recklessness) and <u>In re Uwimana</u>, 274 F.3d 806, 811 (4th Cir. 2001)

(innocent mistake can constitute defalcation).  All courts require at least a threshold showing of

failure to account for funds held in trust by the debtor.  In this case, the debtor presented a

credible explanation of the funds she managed on her mother's behalf during the year before her

mother died.  While the accounting was not precise, it was sufficient under the circumstances.

The plaintiff's quest to declare nondischargeable the debt due from the debtor in connection with

her activities as attorney in fact for her mother under section 523(a)(4) is rejected.


     2.    <u>Debtor as Executrix</u>.


In her role as executrix after her mother died, the debtor served in a "fiduciary capacity"

as contemplated by section 523(a)(4), but did not commit "defalcation" by her actions.


As noted, above, the requisite fiduciary relationship that must be shown for purposes of

section 523(a)(4) is not limited to trusts that arise by virtue of a formal trust agreement, but

includes relationships in which trust-type obligations are imposed pursuant to statute or common

law.  <u>In re Librandi</u>, 183 B.R. 379, 382 (M.D. Pa. 1995).  "To show a fiduciary capacity arising

from a statutorily created trust for the purposes of section 523(a)(4), a creditor must point to an

express legislative design to create a trust relationship".  <u>In re Christian</u>, 172 B.R. 490, 495

(Bankr. D. Mass. 1994)(citations omitted).


Under New Jersey law governing executors of wills, there is an express legislative design

to create a trust relationship between the executor and the creditors and other parties in interest of

the decedent's estate.  An executor is included within the definition of "personal representative".

N.J.S.A. 3B:1-2.  N.J.S.A. 3B:10-30 provides as follows:

> Until termination of his appointment, a personal representative has the same
> power over the title to property of the estate that an absolute owner would have, in
> trust, however, for the benefit of the creditors and others interested in the estate.
> This power may be exercised without notice, hearing, or order of court.

For purposes of this discussion, the emphasis is on the establishment of a "trust" for property of

the decedent's estate.[22]  Because the New Jersey statute expressly creates a trust between the

debtor and plaintiff, as a creditor of her mother's estate, the "fiduciary capacity" element of

section 523(a)(4) is met.

The question remaining is whether the debtor committed defalcation in failing to account

for the proceeds of the personal injury recovery she received in March 2005, on behalf of her

mother's decedent's estate, while she was serving as executrix of her will.  As noted above,

courts have disagreed about the required degree of culpability to establish a section 523(a)(4)

defalcation.  Here, the debtor's actions may be characterized as constituting innocent mistake or

---

[22]    New Jersey cases which have distinguished between a trustee and an executor of a
decedent's estate have distinguished the two not on the grounds that an executor does not hold
property in trust.  Rather, the distinction has been that an executor, unlike a trustee appointed
under a will, does not occupy the position of a legatee who has a pecuniary interest or personal
right or duty which gives him standing to contest a will.  In re Rogers' Estate, 83 A.2d 268, 15
N.J. Super. 189 (Essex County Court Probate Division 1951).  See also In re Heller's Estate, 13
A.2d 303, 18 N.J. Misc. 293 (Orphans Court of New Jersey, Warren County 1940)("an executor
is not a trustee but they are both fiduciaries").

simple negligence. In the absence of Third Circuit precedent, I am persuaded by the cogent and

comprehensive analysis found in the case of In re Ellenbogen, 218 B.R. 709 (Bankr. S.D.N.Y.

1998) that negligence alone is not sufficient to establish defalcation, and that some affirmative

showing of misconduct, which is absent here, would be necessary.

In Ellenbogen, the debtor was found liable in state court for his negligent investment

performance as a trustee for an express trust.  The plaintiff sought a determination of

nondischargeability under section 523(a)(4), claiming that the debtor's negligent actions

constituted defalcation in a fiduciary capacity.  To analyze the term "defalcation," the court

turned first to the customary use and dictionary  definitions and determined that defalcation

"undoubtably connotes some element of misconduct beyond mere negligence." Id. at 716 (citing

to Black's Law Dictionary and various other English dictionaries).  The court reasoned that "[t]o

construe defalcation to mean mere negligence would conflict with the meaning attributed to the

word in common parlance and in virtually every authoritative source." Id. at 716-17.  More

importantly, the court concluded that such a broad definition would conflict with the basic

bankruptcy concept "that the section 523(a) exceptions to discharge must be strictly construed to

comport with the 'fresh start' philosophy underlying the Bankruptcy Code. Id. at 717.  "It

follows that non-dischargeability is 'perceived to be a punitive exception to the "fresh start"

policy and should be found reluctantly.'" Id. (quoting In re Martomak, 67 B.R. 727, 728 (Bankr.

S.D.N.Y. 1986)).  Such a determination was also consistent with the rule of ejusdem generis.  All

of the other terms used in section 523(a)(4), fraud, embezzlement and larceny, require some

"affirmative misconduct by the debtor." Id. at 717-18.  The court concluded:

> Since Congress nowhere expressly created an exception to discharge for
> negligence, it is anomalous to construe defalcation in a manner which is markedly
> at variance both with the other conduct-based exceptions to discharge provided by
> Congress and with the plain and ordinary dictionary meaning of the word.
> Finally, since negligence alone does not connote dishonesty, denial of discharge
> for negligence would conflict with the universally-recognized objective of the
> bankruptcy laws to provide a fresh start to the "honest debtor."

Id. at 718.

I agree.  "At a minimum, a defalcation for purposes of Section 523(a)(4) must arise from

conduct that justifies the substantial penalty of denial of dischargeability . . . .  This penalty is not

lightly to be invoked, as it is widely recognized that exceptions to discharge are narrowly

construed."  In re Duncan, 331 B.R. 70, 87 (Bankr. E.D.N.Y. 2005).  In other words, there must

be "something more" than mere negligence or innocent mistake to justify taking away the

debtor's chance at a "fresh start."  See In re Massaro, 235 B.R. 757, 763 (Bankr. D.N.J. 1999)

("The weight of case authority holds that affirmative misconduct is required to constitute

'defalcation.'").

As I discussed under the section 727(a)(2)(A) and 523(a)(2)(A) analyses, I cannot find

any fraudulent intent or affirmative misconduct on the part of the debtor with regard to her

handling of the proceeds from the personal injury settlement.  At best, the debtor's actions were

the result of innocent mistake or simple negligence.  Without more, such actions do not rise to

the level of defalcation required to deny the debtor her discharge with respect to this debt.   The

plaintiff's quest for this relief is also denied.

-38-

## CONCLUSION

I therefore conclude that the debtor is entitled to receive her discharge under 11 U.S.C. §

727(c), and may be discharged of the debt due from her to the plaintiff herein.

Debtor's counsel shall submit an order in conformance with this opinion.

Dated:   July 10, 2007

_____
JUDITH H. WIZMUR
CHIEF U.S. BANKRUPTCY JUDGE